# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**DERRICK REEVES**
       **Plaintiff,**

   v.                                      **Case No. 20-C-1242**

**KILOLO KIJAKAZI,**[1]
**Acting Commissioner of the Social Security Administration**
       **Defendant.**

## DECISION AND ORDER

On March 1, 2018, plaintiff Derrick Reeves filed an application for social security disability benefits, alleging that he became disabled as of September 1, 2015 due to back, neck, elbow, and hand impairments. (Tr. at 195, 209.) The agency collected plaintiff's medical records, which revealed that he underwent cervical spine fusion surgery in May 2012 (Tr. at 20, 645), lumbar spine fusion surgery in January 2016 (Tr. at 21, 348-54), and carpal/cubital tunnel surgeries in January and April 2018 (Tr. at 21, 55, 89-90, 621, 626, 632, 686-91). Plaintiff reported that his impairments affected his ability to lift, stand, walk, sit, and use his hands. (Tr. at 226.) The record further revealed that plaintiff was a high school graduate, with a work history of medium, semi-skilled jobs. (Tr. at 47, 70, 100-101, 308.) He stopped working after sustaining a back injury in 2015. (Tr. at 50, 394.)

On June 29, 2018, the agency sent plaintiff for a consultative exam with Dr. A. Neil Johnson, who concluded:

> [Plaintiff] has had surgery to both elbows and both wrists this year. He has numbness at his elbows now. He still has a positive Tinel's sign at both wrists.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Kilolo Kijakazi is substituted as the defendant.

> Pinch and grips are reduced. He is limited to two pounds. He certainly is going to have a lot of trouble using his arms and hands. He has a long way to go regarding this. If you combine his neck, back and both wrists and elbows he is very limited.

(Tr. at 790.)

The agency partially approved the application, finding plaintiff disabled as of January 23, 2018 (Tr. at 13, 91, 102, 121), the date of his first carpal/cubital tunnel surgery (Tr. at 626), based on the findings of Drs. William Fowler and Phyllis Sandell who opined, based on a review of plaintiff's medical records and the results of the consultative examination, that plaintiff was limited to sedentary work, with occasional use of the hands as of that date (but not before) (Tr. at 90, 94-96, 112-16). See SSR 96-9p, 1996 SSR LEXIS 6, at *7-8, *22-23 (stating that most unskilled sedentary jobs require good use of the hands and fingers, that any significant manipulative limitation will result in a significant erosion of the unskilled sedentary occupational base, and that a finding of "disabled" usually applies when the full range of sedentary work is significantly eroded).

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), challenging the onset date (Tr. at 36, 139), but the request backfired when the ALJ found plaintiff capable of <u>frequent</u> handling (Tr. at 20) and thus able to perform a number of unskilled, sedentary jobs (Tr. at 25). The ALJ did find plaintiff disabled as of February 19, 2020, using the Grid rules for persons limited to sedentary work and closely approaching advanced age. See 20 C.F.R. Pt. 404, Subpt. P, Appx. 2, § 201.14 (providing that a person aged 50-54 years old, limited to sedentary work, unable to perform past work, and lacking transferable work skills will be found

disabled).[2]

In this action for judicial review, plaintiff no longer argues that he became disabled in September 2015. (Pl.'s Br. at 1.) Rather, he contends that the ALJ erred in overturning the agency's finding of disability as of January 2018. (Pl.'s Br. at 1-2.) I agree that the ALJ failed to adequately explain why he discounted the unanimous medical opinion of the agency's own physicians that plaintiff was significantly limited in the ability to use his hands as of January 2018. I thus remand for further proceedings.

## I. FACTS AND BACKGROUND

Plaintiff bases this appeal solely on the ALJ's consideration of his manipulative limitations. I accordingly focus my review of the record on the related impairments.

### A. Medical Evidence

On September 13, 2017, plaintiff saw Dr. Amy Coulthard-Atwater, his primary physician, with a complaint of right elbow pain. He described the pain as sharp and shooting with numbness and tingling. (Tr. at 730.) He denied weakness. He told Dr. Atwater that he was not employed at the time but did do some work in his "garage." (Tr. at 731.) On exam, he displayed full range of motion with flexion, extension, and pronation/supination of the right elbow, but with tenderness to palpation over the medial epicondyles. Sensation was intact. (Tr. at 732.) Dr. Atwater assessed right tennis elbow, providing an elbow splint and a referral to orthopedics for a possible injection. (Tr. at 732-33.)

On September 14, 2017, plaintiff saw Dr. Harold Schock regarding his complaint of right

---

[2]Plaintiff did not turn 50 until May 12, 2020 (see Tr. at 85), but the ALJ noted that he was within three months of that milestone on the date of decision. The ALJ declined to apply the age categories mechanically and found plaintiff disabled as of February 19, 2020. (Tr. at 24.)

3

elbow pain, with numbness and tingling. (Tr. at 644.) Evaluation of the right elbow revealed tenderness to palpation over the medial epicondyle, less tenderness to palpation over the lateral epicondyle, and positive "piano key test."[3] (Tr. at 646.) Dr. Schock assessed right elbow medial epicondylitis, recommended a tennis elbow band, and provided a corticosteroid injection (Tr. at 646-47.) X-rays of the right elbow revealed no evidence of degenerative change or loose body. (Tr. at 737.)

On December 14, 2017, plaintiff returned for re-evaluation, reporting one month of relief from the injection before the pain returned. (Tr. at 652.) On exam, Dr. Schock noted positive Tinel's sign about the elbow on the affected side,[4] as well as decreased sensation in the fourth and fifth digits, but no muscle atrophy. He assessed possible cubital tunnel syndrome, suggesting an EMG to confirm the diagnosis. (Tr. at 653.) The EMG revealed ulnar nerve compression and median nerve compression. (Tr. at 660.)

At a pre-operative exam on January 18, 2018, a physician's assistant noted pain directly over the ulnar nerve, positive Tinel's, and decreased sensation over the fourth and fifth digits. (Tr. at 660.) On January 23, 2018, Dr. Schock performed right carpal tunnel and right cubital tunnel release surgery. (Tr. at 667, 686-88.)

---

[3]The Piano-Key Sign Test is a test carried out for the clinical assessment of wrist instability. It is used as an indicator for distal radio-ulnar joint instability and tears of the triangular fibrocartilage complex of the wrist. https://www.physio-pedia.com/Piano_Key_Sign (last visited November 10, 2021).

[4]Tinel's test is used to test for compression neuropathy, commonly in diagnosing carpal tunnel syndrome. It is performed by lightly tapping over the nerve to elicit a sensation of tingling or "pins and needles" in the distribution of the nerve. The Tinel sign is the tingling or prickling sensation elicited by the percussion of an injured nerve trunk at or distal to the site of the lesion. https://www.physio-pedia.com/Tinel%E2%80%99s_Test (last visited November 10, 2021).

4

At a follow-up appointment on February 1, 2018, plaintiff reported constant pain in the medial aspect of the elbow. (Tr. at 667.) On exam, he displayed no pain with elbow motion and pronation/supination of the forearm. He denied numbness or tingling to the hand, fingers, or forearm. He reported mild tenderness to the medial elbow incision, which was accompanied by mild effusion. He was to continue with pain medications, limit lifting to two pounds over the next month, ice the elbow, and return for follow-up in four weeks. (Tr. at 668.)

On March 8, 2018, plaintiff reported no numbness or tingling in his fingers or hand, but a lot of tenderness over his cubital tunnel incision. He further reported pain with his carpal tunnel incision when he pushed himself up out of a chair. (Tr. at 672.) Plaintiff also mentioned some left elbow pain, located directly over the distal biceps tendon; he denied any numbness and tingling in his fingers/hand. Dr. Schock ordered additional EMG testing (Tr. at 673) and subsequently recommended surgery on the left side (Tr. at 629).

On April 3, 2018, Dr. Schock performed left cubital tunnel and left carpal tunnel release surgery. (Tr. at 689-91.) On April 12, 2018, plaintiff reported things were going well. He denied any numbness or tingling in any of his digits. However, he did report pain in his elbow and weakness in his hand. Dr. Schock limited lifting to one-two pounds with the operative arm. (Tr. at 678.)

On May 7, 2018, plaintiff reported improvement in his symptoms since last seen. (Tr. at 683-84.) He still had some burning sensation in his left wrist, but his elbow had improved. He further stated that the numbness and tingling in his fingers had improved, but he still had trouble with over-exertion causing numbness to return. He also stated that his symptoms worsened at night, causing trouble sleeping. Dr. Schock indicated plaintiff was "progressing appropriately" and would follow-up as needed. (Tr. at 684.)

5

On June 29, 2018, plaintiff saw Dr. Johnson for his consultative exam, with chief complaints of neck and back pain, bilateral ulnar nerve, and carpal tunnel syndrome. He reported ongoing back and neck pain following his previous surgeries. More recently, he underwent carpal tunnel surgeries—on the right several months ago and on the left about 1½ months ago.

> He has very poor grips and in fact he has been told not to lift more than two pounds. He has numbness at both elbows. He has stinging pain at the wrists more so on the left. It is hard to button or pick up a coin, [and] his writing is not as good. He can use his silverware. He cannot open a jar lid. He cannot use a hammer or screwdriver.

(Tr. at 786.) On exam, Dr. Johnson noted numbness at the elbows, positive Tinel's sign at both wrists, hyperesthesia by the left wrist, and swelling at the left wrist. (Tr. at 788.) Dr. Johnson further noted "weakness of the upper arms at the forearms at 4/5. Hand grips and pinch are weak at the hands." (Tr. at 789.) Dr. Johnson performed testing using a B&L Pinch Gauge and Jamar Dynamometer (grip testing). (Tr. at 791.) As indicated above, Dr. Johnson concluded that plaintiff "certainly is going to have a lot of trouble using his arms and hands. He has a long way to go regarding this. If you combine his neck, back and both wrists and elbows he is very limited." (Tr. at 790.)

In October 2018, plaintiff was seen for a left ring finger laceration, which quickly healed. (Tr. at 829-30.) The subsequent records from late 2018 and 2019 indicate that plaintiff saw Dr. Atwater for unrelated issues and illnesses (Tr. at 834-37, 841-43), and Dr. Hind Gautum, an anesthesiologist, for back pain, neck pain, and headaches (Tr. at 807-13, 837-40). During a November 2018 visit with Dr. Gautum, plaintiff reported left hand and elbow pain (Tr. at 809), and in June 2019 plaintiff advised Dr. Gautum that his neck impairment caused intermittent numbness and tingling down in his hands (Tr. at 837). However, the records contain no

6

mention of further treatment for the hands/wrists/elbows.

**B.   Hearing Testimony**

At the November 2019 hearing, plaintiff testified that his surgeries helped, although he still had pain in the hands and elbows. "I guess maybe 20 percent it helped." (Tr. at 55.) The ALJ asked if plaintiff had received further treatment for his lower arms since the surgeries, and plaintiff respond: "No. I just believe there is nothing more they can do." (Tr. at 55.) Asked if he had talked to his doctors about it, plaintiff responded: "I did talk with them, and they just said that it is was it is. You know, as far as the wrists and that, there is no other really more surgery you could have other – you know, in the palm and in the elbow for that, you know." (Tr. at 55-56.) Asked what sort of issues he had, plaintiff stated: "My hands are swelled up[.]" (Tr. at 56.) He further reported "pain in my elbow when I move my elbow, it affects, you know, trying to lift something[.] [S]o far as the hands and elbows, it just – you can't really grab stuff like you want to in the mornings. . . . It kind of feels like you slept on them[.]" (Tr. at 56.) He further testified that he had trouble trying to grasp small objects (Tr. at 65) and issues with numbness and swelling in his hands after five minutes of an activity such as washing dishes (Tr. at 66).

**C.   ALJ's Decision**

In his February 2020 decision, the ALJ agreed that plaintiff's lumbar and cervical spine impairments were severe (Tr. at 17), limiting plaintiff to sedentary work (Tr. at 19). The ALJ further agreed that plaintiff's carpal tunnel syndrome was severe (Tr. at 17), but he found that plaintiff could frequently handle and finger with the bilateral upper extremities (Tr. at 20).

The ALJ discussed plaintiff's treatment for his lower arm issues, noting that he presented with complaints of right elbow pain in September 2017 (Tr. at 21, citing Tr. at 644),

7

with subsequent exams revealing a positive Tinel's sign and decreased sensation, but no muscle atrophy; the provider assessed possible cubital tunnel syndrome. (Tr. at 21, citing Tr. at 653.) A January 2018 EMG revealed ulnar nerve compression and median nerve compression. (Tr. at 21, citing Tr. at 660.) Exam findings in January and March 2018 were abnormal, showing pain directly over the ulnar nerve, positive Tinel's, minimal numbness and tingling, significant tenderness to palpation over the distal biceps tendon, and decreased sensation over the fourth and fifth digits. (Tr. at 21, citing Tr. at 660, 673.) Plaintiff underwent right cubital tunnel release in January 2018 and left cubital tunnel release in April 2018. (Tr. at 21, citing Tr. at 686-91.) The consultative examiner, Dr. Johnson, noted elbow numbness, positive Tinel's sign at both wrists, hyperesthesia by the left wrist, swelling at the left wrist, weakness of the upper arms, and weak handgrip and pinch. (Tr. at 21, citing Tr. at 788-89.)

The ALJ also discussed plaintiff's testimony, noting that he alleged pain in his hands and elbows. Plaintiff further stated that his hands were swollen, he experienced pain in the elbow with movement, numbness, and difficulty grabbing items. (Tr. at 20.) The ALJ found these statements not fully consistent with the record, noting that aside from the surgeries plaintiff's treatment was largely conservative, with no planned additional treatment for his hands/elbows. (Tr. at 22.) The record noted a two pound lifting restriction following surgery, but this was not intended to be permanent. (Tr. at 22, 24.) A May 2018 treatment note reflected plaintiff's report of improvement in his elbow, numbness and tingling of his fingers, and only problems with over-exertion. The provider noted that plaintiff was progressing appropriately, advising him to follow up as needed. (Tr. at 22, citing Tr. at 684.) Subsequent records from late 2018 and 2019 did not document any ongoing issues with plaintiff's hands/wrists, which, the ALJ said, further suggested that the surgery was successful. (Tr. at 22.)

The ALJ concluded that the records did not suggest plaintiff would have significant handling and fingering limitations post-surgery. The ALJ stated that the surgeries themselves were routine in nature and subsequent treatment records did not reflect complications or concerns. There was no documentation of significant issues with grip, strength, or dexterity that would support need for a restriction of more than frequent handling and fingering. Updated records from 2018 and 2019 also showed limited care/treatment for back/neck pain, despite the fact that plaintiff likely had a better ability to obtain care/treatment with insurance through disability. (Tr. at 22.)

The ALJ next discussed the medical opinions, noting that Dr. Fowler, the agency consultant at the initial level, found plaintiff limited to sedentary work with occasional handling. (Tr. at 22, citing Tr. at 94-96.) The ALJ accepted Dr. Fowler's exertional limitation but rejected his manipulative limitation, stating that "there was no documentation of significant ongoing issues with his hands/wrists, such as limited grip, strength, [and] dexterity to support the opined limitation to occasional bilateral handling, fingering and feeling." (Tr. at 23.)

The ALJ likewise partially credit the consultant at the reconsideration level, Dr. Sandell, who largely agreed with Dr. Fowler. Dr. Sandell also opined that from September 2017 through January 2018 plaintiff was limited to occasional reaching with the right upper extremity. (Tr. at 23, citing Tr. at 117.) "As discussed above, while there [is] support for the opinion given notation of the prior carpal tunnel release surgery, there was no documentation of significant ongoing issues with his hands/wrists, such as limited grip, strength [or] dexterity to support the opined limitation to occasional right upper extremity reaching." (Tr. at 23.)

9

## II.  DISCUSSION

**A.	Standard of Review**

The court will uphold an ALJ's decision if it uses the correct legal standards, is supported by substantial evidence, and sets forth an accurate and logical bridge from the evidence to the conclusions.  Jeske v. Saul, 955 F.3d 583, 587 (7th Cir. 2020).  Substantial evidence means such relevant evidence as a reasonable mind could accept as adequate to support a conclusion.  Kaplarevic v. Saul, 3 F.4th 940, 942 (7th Cir. 2021) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).  While the court may not, under this deferential standard, re-weigh the evidence or substitute its judgment for that of the ALJ, the court must ensure that the ALJ considered the important evidence and provided adequate reasons for his conclusions.  See, e.g., Anders v. Saul, 860 Fed. Appx. 428, 432 (7th Cir. 2021); Scott v. Barnhart, 297 F.3d 589, 595 (7th Cir. 2002).

**B.	Plaintiff's Argument**

Plaintiff argues that the ALJ erred in rejecting the opinions of the agency reviewing physicians, Drs. Fowler and Sandell, that he was limited to occasional handling.  He notes that no medical opinion in the record indicates that he can use his hands frequently, as the ALJ found.  He further contends that, if the ALJ had concerns about whether the later medical evidence called for a different conclusion, the ALJ could have ordered an additional consultative examination or summoned a medical expert to the hearing.  Instead, the ALJ rejected all of the available medical opinions and pushed the onset date back more than two years, when plaintiff's age category changed.  (Pl.'s Br. at 11.)

"[T]he determination of a claimant's [residual functional capacity] is a matter for the ALJ

10

alone—not a treating or examining doctor—to decide." Thomas v. Colvin, 745 F.3d 802, 808 (7th Cir. 2014). In determining RFC, the ALJ considers the entire record and is not required to rely entirely on a particular physician's opinion. Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007). Nevertheless, as the Seventh Circuit has noted, rejecting "the opinion of an agency's doctor that supports a disability finding is 'unusual' and 'can be expected to cause a reviewing court to take notice and await a good explanation.'" Jones v. Saul, 823 Fed. Appx. 434, 439 (7th Cir. 2020) (quoting Beardsley v. Colvin, 758 F.3d 834, 839 (7th Cir. 2014)); see also Garcia v. Colvin, 741 F.3d 758, 761 (7th Cir. 2013) (noting that an agency doctor is unlikely "to exaggerate an applicant's disability, as the applicant is not his patient and favoritism with applicants would not go down well with the agency") (internal citation omitted); 20 C.F.R. § 404.1513a(b)(1) (stating that agency consultants "are highly qualified and experts in Social Security disability evaluation").[5]

Here, the ALJ discounted the consultants' manipulative limitations because "there was no documentation of significant ongoing issues with [plaintiff's] hands/wrists, such as limited grip, strength, [and] dexterity to support the opined limitation to occasional bilateral handling, fingering and feeling." (Pl.'s Br. at 12, quoting Tr. at 23.) Earlier in his decision, the ALJ stated that "the surgeries themselves were routine in nature"; at a May 2018 follow-up, plaintiff reported "improvement" and Dr. Schock stated plaintiff was "progressing appropriately"; and "subsequent treatment records did not reflect complications or concerns." (Tr. at 22.)

---

[5] Beardsley addressed an ALJ's rejection of the opinion of an examining consultant. In the present case, Drs. Fowler and Sandell were reviewing rather than examining physicians, but they based their opinions in part on the examination conducted by Dr. Johnson, which revealed significant manipulative limitations. In any event, Jones applied the "good explanation" standard to the rejection of agency reviewing physician opinions.

11

The ALJ's characterization of the surgeries as "routine" is questionable. See, e.g., Booth v. Colvin, No. 14 CV 50347, 2016 U.S. Dist. LEXIS 82754, at *16-17 (N.D. Ill. June 27, 2016) (finding that an ALJ improperly "played doctor" in characterizing treatment as routine). More importantly, the ALJ overlooked significant evidence suggesting that plaintiff did have ongoing problems after the surgeries.

During his June 29, 2018 exam, Dr. Johnson noted numbness in both elbows when tapped, positive Tinel's sign at both wrists, hyperesthesia by the left wrist, and swelling at the left wrist. (Tr. at 788.) On dynamometer and pinch gauge testing, plaintiff displayed significant weakness. (Tr. at 789, 791.) Dr. Johnson concluded that plaintiff "certainly is going to have a lot of trouble using his arms and hands. He has a long way to go regarding this." (Tr. at 790.) While the ALJ briefly discussed Dr. Johnson's exam findings earlier in his decision (Tr. at 21), he did not grapple with those findings in evaluating the agency opinions regarding the extent of plaintiff's manipulative limitation. See Hardy v. Berryhill, 908 F.3d 309, 312 (7th Cir. 2018) ("An ALJ must grapple with lines of evidence that are contrary to her conclusion, and here the ALJ did not do so.").

As for the medical evidence from late 2018 and 2019, it appears that plaintiff did complain of left hand and elbow pain during a November 2018 visit with Dr. Gautum (Tr. at 809) and report numbness and tingling in his hands during his June 2019 visit with Dr. Gautum (Tr. at 837). The Commissioner argues that the November 2018 reference may have been a holdover notation from a previous visit, and that the June 2019 note is equally unclear. (Def.'s Br. at 13-14.) But the ALJ did not say that, and my review is limited to the reasons he provided (or failed to provide). See Jeske, 955 F.3d at 587; see also Wiersma v. Astrue, No. 10-C-240, 2010 U.S. Dist. LEXIS 134755, at *27 (E.D. Wis. Dec. 8, 2010) ("[I]t is the ALJ's job, not the

12

court's, to review the record and resolve conflicts and ambiguities in the evidence[.]").

In any event, nothing in the later records affirmatively states that plaintiff's condition significantly improved following the evaluations by Drs. Johnson, Fowler, and Sandell.[6] While the ALJ was permitted to consider whether the later evidence made the consultants' opinions "more or less persuasive," 20 C.F.R. § 404.1520c(c)(5), it is unclear how the subsequent records in this case justified the rejection of every medical opinion on the issue. It is also significant that plaintiff was not working during this time; as plaintiff told Dr. Schock during the May 2018 encounter, "he still has trouble with over exertion of his numbness returning." (Tr. at 684.)

Finally, while it is true that plaintiff received no further treatment for his lower arms, the ALJ failed to consider plaintiff's explanation for that. See SSR 16-3p, 2016 SSR LEXIS 4, at *23 (indicating that the ALJ should not hold lack of treatment against a claimant without considering possible reasons why he did not seek treatment consistent with the degree of his complaints). At the hearing, plaintiff testified that he talked to his doctors about further treatment, but they indicated "there is nothing more they can do." (Tr. at 55.) SSR 16-3p specifically mentions, as a possible reason: "A medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual." Id. at *24. The Ruling required the ALJ to consider this explanation, id. at *25 ("We will explain how we considered the individual's reasons in our evaluation of the individual's symptoms."), but the ALJ failed to do so. See Akin v. Berryhill, 887 F.3d 314, 318 (7th Cir.

---

[6]Plaintiff notes that no medical record shows his two pound lifting restriction was released or relaxed in any way. (Pl.'s Br. at 13.) However, it was not unreasonable for the ALJ to conclude that this was a temporary restriction following surgery. (Tr. at 24; see Tr. at 668: "We discussed max lifting 2 lbs over the next month[.]".)

13

2018) ("The ALJ did not consider Akin's explanations for not seeking more aggressive treatments, as he was required to do."). The ALJ noted that plaintiff had the ability to obtain care/treatment with insurance through disability (Tr. at 22), but plaintiff never alleged poverty as an excuse.

The Commissioner cites a number of decisions affirming the denial of benefits based in part on the claimant's lack of treatment for the allegedly disabling impairments (Def.'s Br. at 12), but this overlooks plaintiff's explanation for why he obtained no further treatment for his lower arms in this case. The Commissioner argues that SSR 16-3p applies to subjective symptom evaluation, rather than the weighing of medical opinions (Def.'s Br. at 16), but this takes too narrow a view of the ALJ's obligation to consider all of the evidence, including the claimant's testimony, in determining RFC. See Durr-Irving v. Colvin, 600 Fed. Appx. 998, 1003 (7th Cir. 2015). The Commissioner also argues that plaintiff's explanation—that his doctors had nothing more to offer—does not address why plaintiff failed to mention his hand issues after June 2018 if he was still experiencing symptoms. (Def.'s Br. at 16.) As indicated above, the record arguably does contain reference to such complaints, an issue the ALJ must address on remand.

### III. CONCLUSION

Judicial review of an ALJ's decision is deferential. But under the unusual circumstances here, where all of the medical opinions support limitations more restrictive than the ALJ's conclusion, and the ALJ cited no specific medical evidence contradicting those opinions, the decision cannot stand. See Jones, 823 Fed. Appx. at 439:

> Here, the ALJ discounted the doctors' assessments as overly restrictive because Jones—after her surgeries—had shown improvement and expressed few complaints. But "ALJs must rely on expert opinions instead of determining the

14

significance of particular medical findings themselves," Lambert v. Berryhill, 896 F.3d 768, 774 (7th Cir. 2018), and no medical source here opined that Jones's post-surgical progress for her recurrent shoulder problem was inconsistent with the consultants' restrictions that she not lift more than 20 pounds[.]

See also Scivally v. Sullivan, 966 F.2d 1070, 1077 (7th Cir. 1992):

All of the physicians' conclusions concerning Ms. Scivally's physical limitations were much more restrictive than the ALJ's conclusion. Moreover, there is no medical evidence or opinion in the record upon which the ALJ relies to contradict these conclusions. . . . In the absence of contradictory medical evidence, the ALJ impermissibly substituted his own medical judgment for that of the physicians. In addition, . . . the ALJ completely disregarded Ms. Scivally's complaints of pain, an omission which may affect his view of the limitations diagnosed by the doctors.

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and the matter is remanded, pursuant to 42 U.S.C. § 405(g), sentence four, for the purpose of determining whether plaintiff was disabled from January 23, 2018, to February 19, 2020. The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 12th day of November, 2021.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge